ORIGINAL

FILED IN OPEN COURT
U.S.D.C. Atlanta

NOV 0 3 2026

Kevin P. Weimer, Clerk
By: Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*v.*<br>CURTIS DEXTER HULL | Criminal Indictment<br>No. 1 26-CR-515 |

THE GRAND JURY CHARGES THAT:

**Count One**
*Conspiracy to Commit Wire Fraud* - 18 U.S.C. § 1349

1. Beginning at least by in or about January 2022, and continuing until at least in or about February 2023, in the Northern District of Georgia and elsewhere, the defendant, **CURTIS DEXTER HULL**, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with Debra Bryant, Debra Farrell, Leonard Medley, and others unknown to the Grand Jury, to knowingly devise and intend to devise a scheme and artifice to defraud lenders, and to obtain money and property from these lenders by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and for the purpose of executing this scheme and artifice to defraud, to cause wire communications to be transmitted in interstate commerce, in violation of Title 18, United States Code, Section 1343.

## Background

At all times relevant to this Indictment:

2. Defendant **CURTIS DEXTER HULL** was a commercial real estate developer operating primarily in metro Atlanta, in the Northern District of Georgia.

3. Debra Bryant was a licensed real estate agent employed at the real estate brokerage firm JP & Associates Realtors.

4. Debra Farrell operated Funding Solutions Financial LLC ("Funding Solutions"), a Georgia limited liability company with a principal place of business in Buford, Georgia. Funding Solutions was a financial company that facilitated obtaining "hard money loans" for borrowers seeking to buy and flip residential properties, to purchase rental properties, and for new construction. Hard money loans are high-interest loans secured by real property.

5. Leonard Medley was a closing attorney based in Atlanta, Georgia.

6. Individual-1 resided outside of the United States and created false and fraudulent documents, including fraudulent bank statements.

7. Alvarez Investment Group LLC ("Alvarez") was a Georgia limited liability company with a principal place of business in Conyers, Georgia. According to Georgia Secretary of State records, J.B. was Alvarez's purported organizer and registered agent. In actuality, **HULL** owned and operated Alvarez.

8. 2 Big Legacy LLC ("2 Big Legacy") was a Georgia limited liability company with a principal place of business in Lithonia, Georgia. C.F. was the purported CEO and managing member of 2 Big Legacy. In actuality, **HULL** owned and operated 2 Big Legacy.

9. 2 Big Holdings LLC ("2 Big Holdings") was a Georgia limited liability company with a principal place of business in Lithonia, Georgia. C.F. was the purported sole member of 2 Big Holdings. In actuality, **HULL** owned and operated 2 Big Holdings.

10. The "MLK Property" was a residential apartment complex located on Martin Luther King Jr. Drive in southwest Atlanta, consisting of approximately 100 garden townhome-style apartments.

11. Lender-1 was a private money lender headquartered in Oregon who financed 2 Big Legacy's purchase of the MLK Property from Alvarez in or about June 2022.

12. Lender-2 was a private money lender who financed Alvarez's purchase of the MLK Property in or about November 2020.

13. The "Brittany Place Property" was a 36-building apartment complex located in Decatur, Georgia, with each building consisting of six one- or two-bedroom units.

14. Maple Key, LLC ("Maple Key") was a Georgia limited liability company with a principal place of business in Roswell, Georgia. Maple Key was the owner of the Brittany Place Property.

15. Spry Holdings, LLC ("Spry Holdings") was a Georgia limited liability company with a principal place of business in Alpharetta, Georgia. C.S. was the sole member of Spry Holdings.

16. Brittany Place 2022, LLC ("BP 2022") was a Georgia limited liability company with a principal place of business in Atlanta, Georgia. C.S. was the sole member of BP 2022. In actuality, **HULL** owned and operated BP 2022.

17. Lender-3 was a private money lender headquartered in California who financed 2 Big Legacy's purchase of two buildings within the Brittany Place Property in or about February 2022.

18. Lender-4 was a private money lender headquartered in the State of Washington who financed 2 Big Legacy's purchase of seven buildings within the Brittany Place Property between in or about February and March 2022.

19. Lender-5 was a private money lender headquartered in California who financed 2 Big Legacy's purchase of six buildings within the Brittany Place Property in or about May 2022.

20. Lender-6 was a private money lender headquartered in North Carolina who financed Spry Holdings' purchase of seven buildings within the Brittany Place Property in or about July 2022.

**Manner and Means**

21. Beginning no later than in or about January 2022 and continuing until at least in or about August 2022, **HULL**, Farrell, Bryant, Medley, and others executed a scheme to fraudulently obtain hard money loans for the purported sale and purchase of residential and commercial properties, including the sale of the MLK Property from Alvarez to 2 Big Legacy involving Lender-1 ("Transaction-1"), the purported sale of multiple units within the Brittany Place Property from Maple Key to 2 Big Legacy in a series of separate transactions involving Lender-3, Lender-4, and Lender-5 (collectively, "Transaction-2"), and the sale of buildings within the Brittany Place Property from Maple Key to Spry Holdings involving Lender-6 (collectively, "Transaction-3").

22. To obtain hard money loans from various institutions, including Lender-1 for the MLK Property and Lender-3, Lender-4, Lender-5, and Lender-6 for the transactions involving the Brittany Place Property, **HULL** and others submitted and caused to be submitted false and fraudulent loan applications that included material misrepresentations, including about the identity of the actual borrower and fabricated bank statements. If Lender-1, for example, had known that Transaction-1 was not arm's length, *i.e.*, that the borrower/buyer and seller were on both sides of the transaction, that the borrower, C.F., was a straw purchaser (as **HULL** knew), that the conspirators had submitted fabricated bank statements, and that the loan proceeds were not used for the intended purpose of financing Transaction-1, Lender-1 would not have approved the loan.

23. Likewise, for Transaction-2, if Lender-3, Lender-4, and Lender-5 had known, among other things, that the borrower, C.F., was a straw purchaser (as **HULL** knew), that the conspirators had submitted fabricated bank statements, that Medley had prepared false and fraudulent settlement statements, that 2 Big Legacy never made the stated contributions, and that the loan proceeds were not used for the intended purpose of financing Transaction-2, Lender-3, Lender-4, and Lender-5 would not have approved the loans.

24. Similarly, for Transaction-3, if Lender-6 had known that the borrower, C.S., was a straw purchaser (as **HULL** knew), that the conspirators had submitted fabricated bank statements, and that Medley had prepared false and fraudulent settlement statements, Lender-6 would not have approved the loans.

MLK Property – Transaction-1

25. Bryant was the listing agent for the MLK Property. On or about March 11, 2022, J.B., on behalf of Alvarez, executed an exclusive seller brokerage agreement with Bryant. The brokerage agreement stated that the MLK Property was being listed for $17,000,000. Under the terms of the brokerage agreement, Bryant was entitled to a commission equal to 1% of the sales price.

26. Beginning in or about February 2022, **HULL** directed Farrell to work with brokers to identify potential lenders to finance Transaction-1.

27. Farrell corresponded with other brokers in her network to obtain financing for **HULL** to purchase the MLK Property through 2 Big Legacy. Through Farrell's network, she identified Lender-1 as a potential source of financing. In or about March 2022, an application for financing was submitted to Lender-1 with C.F. listed as the owner of 2 Big Legacy.

28. As part of the lending process, Lender-1 required bank statements from the borrower, 2 Big Legacy, and its purported owner, C.F. On or about February 3, 2022, Farrell emailed C.F.'s actual bank statements for C.F.'s business to **HULL** and Bryant, including a December 2021 bank statement for C.F.'s business account at JPMorgan Chase account x3536 ("Chase x3536"). As of December 31, 2021, C.F.'s Chase x3536 account showed an ending balance of $623.25. Throughout the lending process, Farrell requested that **HULL** and Bryant provide bank statements for C.F.'s business account, 2 Big Legacy, and 2 Big Holdings. Even though C.F. was the purported owner of 2 Big Legacy and 2 Big Holdings, **HULL**, not C.F., was the lone signatory for the bank accounts in the names of 2 Big Legacy and 2 Big Holdings.

29. Bryant found Individual-1 on Fiverr, an online freelance services marketplace. Bryant paid Individual-1 to prepare fraudulent bank statements. Bryant emailed Individual-1 a copy of C.F.'s actual Chase x3536 December 2021 bank statement, from which Individual-1 generated fake bank statements for the Chase x3536 account for December 2021, January 2022, February 2022, March 2022, April 2022, and May 2022, fraudulently showing ending balances of $6,000,623.25, $6,002,595.14, $8,000,638.25, $8,001,610.14, $8,005,701.98, and $8,006,638.25, respectively. In reality, the balance in the Chase x3536 account for each month was, respectively, $623.25, $11,978.52, $3,457.34, $325.84, $506.10, and $200.16. On various dates, beginning in or about February 2022 and continuing until in or about May 2022, Bryant emailed **HULL** and Farrell the fraudulent bank statements for the Chase x3536 account.

30. On multiple occasions between in or about February 2022 and in or about May 2022, Farrell requested from Bryant (and in some cases **HULL** and Bryant) bank statements for 2 Big Legacy and 2 Big Holdings. Bryant provided fake and fraudulent bank statements for both entities. By way of example:

a. On or about March 3, 2022, Bryant emailed Farrell (copying **HULL**) purported December 2021 and January 2022 bank statements for 2 Big Holdings' Bank of America account x5037 ("BOA x5037"), showing ending balances over $6.8 million for each month. In actuality, the BOA x5037 account was closed in or about October 2021.

b. On or about April 11, 2022, Farrell requested from **HULL** and Bryant a copy of the March 2022 bank statement for 2 Big Legacy's Bank of

America account x4804 ("BOA x4804"). In response, Bryant emailed **HULL** a fraudulent March 2022 statement for the BOA x4804 account showing a balance of $3,070,311.92, when the actual balance was $423,934.85. On or about April 12, 2022, **HULL** forwarded to Farrell the fraudulent March 2022 BOA x4804 statement he had received from Bryant.

31. During the lending process, Farrell electronically submitted and caused to be electronically submitted to Lender-1 the false and fraudulent bank statements for the Chase x3536, BOA x5037, and BOA x4804 accounts for the purpose of misleading Lender-1 into believing that the purported borrower, C.F., had millions in liquid assets. **HULL** and his co-conspirators knew these bank statements were false and fraudulent when they were submitted to Lender-1.

32. Medley was responsible for preparing the certified settlement statement for Transaction-1. The settlement statement was supposed to provide a true and accurate accounting of Transaction-1, including disclosing the following information: the sale price, loan charges, any loan payoffs, title charges, recording fees, and other miscellaneous charges.

33. In preparation for the closing on the MLK Property and prior to Medley releasing any loan proceeds from Lender-1, Medley was required to follow Lender-1's closing instructions, which included preparing a certified settlement statement for Transaction-1. Medley initialed after each of Lender-1's closing instructions acknowledging he followed the instruction. Medley prepared and later submitted the certified settlement statement to Lender-1 for Transaction-1 knowing it contained false information.

34. For example, Lender-1's closing instructions directed Medley to confirm all liens, encumbrances, and mortgages on the MLK Property were either cleared prior to closing or paid through the closing of the escrow. Medley knew that Alvarez owed over approximately $9 million to Lender-2 from when Alvarez purchased the property in November 2020 because Medley was also the closing attorney for that transaction. Medley failed to disclose the outstanding loan to Lender-2 on the settlement statement.

35. Lender-1's closing instructions also required Medley to provide a certified copy of the settlement statement disclosing how the loan proceeds were disbursed at Transaction-1's closing. Medley falsely represented in the certified settlement statement that the buyer, 2 Big Legacy, had transferred approximately $5.9 million to Medley toward the purchase price, and Medley had paid approximately $16.9 million to the seller, Alvarez, at closing. In actuality, Medley knew that he neither received $5.9 million from 2 Big Legacy nor paid $16.9 million to Alvarez at the closing.

36. Medley was further aware, but did not disclose to Lender-1, that the sale of the MLK Property from Alvarez to 2 Big Legacy was not an arm's length transaction because **HULL** was on both sides of the transaction.

37. On or about June 1, 2022, Lender-1 caused a wire transfer of $11,900,000 to be transmitted to Medley's account.

38. The funds received by Medley from Lender-1 were not used in the manner set out in the certified settlement statement prepared by Medley. Instead of paying Alvarez $16.9 million as the seller of the MLK Property, a substantial portion of the funds were used to pay Lender-2. On or about July 1, 2022, Medley

wired $10,324,876.79 to Lender-2. Lender-1 would not have disbursed the loan proceeds to Medley if it knew the certified settlement statement contained false information.

39. After the closing, on or about June 9, 2022, Farrell received $118,955 for her role in Transaction-1.

40. On or about June 9, 2022, Medley wrote a check for $170,000 to JP & Associates Realtors, as the listing agent for the MLK Property. After the closing, on or about June 15, 2022, Bryant received $135,250 for her role in Transaction-1.

41. After not receiving the first scheduled loan payment from 2 Big Legacy in August 2022, Lender-1 began foreclosure proceedings on the MLK Property and ultimately took possession of the property.

Brittany Place Property – Transaction-2

42. Beginning no later than in or about January 2022, **HULL** directed Farrell to work with brokers to identify potential lenders to finance Transaction-2.

43. Farrell corresponded with other brokers in her network to obtain financing for **HULL** to purchase multiple units within the Brittany Place Property through 2 Big Legacy. Through Farrell's network, she identified Lender-3, Lender-4, and Lender-5 as potential sources of financing.

44. As part of the lending process, Lender-3, Lender-4, and Lender-5 required bank statements from the borrower, 2 Big Legacy, and in some instances, bank statements for 2 Big Legacy's purported owner, C.F.

45. For example, on or about February 7, 2022, Farrell emailed Bryant and **HULL** and requested a copy of 2 Big Legacy's January 2022 Bank of America bank statement. On or about February 8, 2022, Bryant emailed **HULL** and Farrell

a purported copy of 2 Big Legacy's January 2022 bank statement showing an ending balance of $3,065,178.63, when in actuality the ending balance in 2 Big Legacy's account in January 2022 was $685,739.90.

46. During the lending process, Farrell electronically submitted and caused to be electronically submitted to Lender-3 and Lender-4 the false and fraudulent January 2022 Bank of America statement for 2 Big Legacy for the purpose of misleading Lender-3 and Lender-4 into believing that the purported borrower, C.F., had millions in liquid assets. **HULL** and his conspirators knew the bank statement was false and fraudulent when it was submitted to Lender-3 and Lender-4.

47. Similarly, on or about April 11, 2022, Farrell emailed **HULL** and Bryant and requested a copy of 2 Big Legacy's March 2022 Bank of America bank statement. On or about the same day, Bryant emailed **HULL** a purported copy of 2 Big Legacy's March 2022 statement showing an ending balance of $3,070,311.92. In actuality, 2 Big Legacy's ending balance in March 2022 was $423,934.85. On or about April 12, 2022, **HULL** forwarded the fraudulent bank statement from Bryant to Farrell.

48. During the lending process, Farrell electronically submitted and caused to be electronically submitted to Lender-5 the false and fraudulent March 2022 Bank of America bank statement for 2 Big Legacy for the purpose of misleading Lender-5 into believing that the purported borrower, C.F., had millions in liquid assets. **HULL** and his conspirators knew the bank statement was false and fraudulent when it was submitted to Lender-5.

49. As part of closing Transaction-2, which constituted a series of separate transactions involving the Brittany Place Property, Medley received closing instructions from Lender-3, Lender-4, and Lender-5, which Medley was required to follow before distributing any loan proceeds from these lenders.

50. For example, on or about May 5, 2022, Lender-5 emailed Medley a list of items to be completed, including substantiating that 2 Big Legacy had provided the required funds to close the transaction. Medley responded that same day stating he was working on completing the required items.

51. On or about May 10, 2022, Medley forwarded Lender-5 an email Medley received from his bank, First Citizens Bank & Trust Co. ("First Citizens"), that stated he had received a wire transfer for $2,465,000 from 2 Big Legacy. Medley failed to disclose to Lender-5 that 2 Big Legacy did not actually provide these funds, but rather Medley was the source of the funds. Medley failed to disclose that he wired funds from an account he controlled to 2 Big Legacy (an account controlled by **HULL**), which 2 Big Legacy in return wired back to Medley.

52. Specifically, on or about May 9, 2022, Medley wired $2,464,131.03 from an account he controlled to 2 Big Legacy's Bank of America account. On or about May 10, 2022, 2 Big Legacy wired $2,465,000 to Medley's First Citizens account x0525 ("First Citizens x0525"). As a result of these two wire transfers, Medley falsely made it appear to Lender-5 that 2 Big Legacy provided the required funds to close the transaction.

53. Lender-3, Lender-4, and Lender-5's closing instructions also required Medley to provide a certified copy of the settlement statement disclosing how the loan proceeds were disbursed at the closings. Medley prepared false and

fraudulent settlement statements indicating that the loan proceeds had been distributed to Maple Key and the transactions (collectively, Transaction-2) had closed. In actuality, as Medley knew, Maple Key did not receive the loan proceeds to close on the sale of the properties. Medley in fact failed to properly record the transactions as required by Lender-3, Lender-4, and Lender-5, despite representing to the contrary that he had done so.

54. **HULL**, Medley, and others also failed to disclose to Lender-3, Lender-4, and Lender-5 the existence of a purported agreement between 2 Big Legacy and Maple Key under which Maple Key supposedly agreed to allow 2 Big Legacy to use the proceeds from the closings. Lender-3, Lender-4, and Lender-5 would never have approved the loans had they known that 2 Big Legacy had not used the proceeds to close any of the transactions with Maple Key.

55. In or about February 2022, Lender-3 disbursed over $2 million in loan proceeds via wire transfers to Medley's Truist account x0910 ("Truist x0910"). From in or about February 2022 until in or about March 2022, Lender-4 caused wire transfers totaling over $6.4 million to be transmitted to Medley's Truist x0910 account. In or about May 2022, Lender-5 caused wire transfers totaling over $5 million to be transmitted to Medley's First Citizens x0525 account.

<u>Brittany Place – Transaction-3</u>

56. Beginning on a date unknown but no later than in or about June 2022, **HULL** directed Farrell to work with brokers to identify potential lenders to finance Transaction-3.

57. Farrell corresponded with other brokers in her network to obtain financing for **HULL** to purchase multiple buildings within the Brittany Place

Property through BP 2022. Through Farrell's network, she identified Lender-6 as a potential source of financing.

58. As part of the lending process, Lender-6 required bank statements from the borrower, C.S., and the C.S.'s company, Spry Holdings. For example, on or about July 12, 2022, Farrell emailed Spry Holdings's actual bank statements to **HULL** and Bryant. The bank statements were for April, May, and June 2022 for Spry Holdings's Capital One bank account showing ending balances of $65,435.24, $56,236.24, and $53,828.73, respectively. In the email, Farrell asked **HULL** and Bryant to "update" the bank statements.

59. Bryant worked with Individual-1 to create false and fraudulent April, May, and June 2022 Capital One bank statements for Spry Holdings. On or about July 12, 2022, Individual-1 emailed Bryant fraudulent bank statements for April, May, and June 2022 for Spry Holdings's Capital One account showing ending balances of $5,065,435.24, $5,056,236.24, and $5,053,828.73, respectively. On or about July 13, 2022, Bryant emailed the fake bank statements created by Individual-1 to **HULL** and Farrell.

60. During the lending process, Farrell electronically submitted and caused to be electronically submitted to Lender-6 the false and fraudulent May and June 2022 Capital One bank statements for Spry Holdings for the purpose of misleading Lender-6 into believing that the purported borrower, Spry Holdings, had millions in liquid assets. **HULL** and his conspirators knew the bank statements were false and fraudulent when they were ultimately submitted to Lender-6.

61. In preparation for the closing of Transaction-3, and prior to Medley releasing any loan proceeds received from Lender-6, Medley was required to follow Lender-6's closing instructions. Lender-6's closing instructions required Medley to provide a certified copy of the settlement statements disclosing how the loan proceeds were disbursed at Transaction-3's closing. Medley provided settlement statements knowing they falsely misrepresented that BP 2022 had provided funds for a down payment when, in actuality, BP 2022 had not.

62. On or about July 25, 2022, Lender-6 caused a wire transfer totaling over $8 million to be transmitted to Medley's account. Lender-6 would not have disbursed the loan proceeds to Medley if it knew the certified settlements contained false information.

63. Shortly after wiring the funds to Medley, Lender-6 learned that there were improprieties with Transaction-3, and on or about July 28, 2022, Lender-6 informed Farrell that the loan proceeds needed to be returned. On or about August 1, 2022, Medley wired the loan proceeds back to Lender-6.

All in violation of Title 18, United States Code, Section 1349.

**Counts 2 through 16**

*Wire Fraud* - 18 U.S.C. §§ 1343 & 2

64. The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 2 through 63 of this Indictment as if fully set forth herein.

65. On or about the dates set forth in the following table, in the Northern District of Georgia and elsewhere, the defendant, **CURTIS DEXTER HULL,** aided and abetted by, and aiding and abetting, Debra Bryant, Debra Farrell, Leonard Medley, and others unknown to the Grand Jury, knowingly devised

and intended to devise a scheme and artifice to defraud lenders, and to obtain money and property from lenders, by means of materially false and fraudulent pretenses, representations, and promises, and by omissions of material facts, and for the purpose of executing the scheme and artifice to defraud, caused to be transmitted by means of wire communications in interstate and foreign commerce the following writings, signs, signals, pictures, and sounds described in the following table:

| Count | Date (on or about) | Wire Communication |
|---|---|---|
| 2 | 2/24/2022 | Wire transfer of $921,408.10 from Lender-4 to Medley's Truist x0910 account. |
| 3 | 2/25/2022 | Wire transfer of $1,022,173.00 from Lender-3 to Medley's Truist x0910 account. |
| 4 | 2/25/2022 | Wire transfer of $1,022,230.32 from Lender-3 to Medley's Truist x0910 account. |
| 5 | 3/7/2022 | Wire transfer of $915,495.50 from Lender-4 to Medley's Truist x0910 account. |
| 6 | 3/11/2022 | Wire transfer $916,678.02 from Lender-4 to Medley's Truist x0910 account. |
| 7 | 3/18/2022 | Wire transfer of $918,747.43 from Lender-4 to Medley's Truist x0910 account. |
| 8 | 3/21/2022 | Wire transfer of $919,634.32 from Lender-4 to Medley's Truist x0910 account. |
| 9 | 3/25/2022 | Wire transfer of $920,816.84 from Lender-4 to Medley's Truist x0910 account. |

| Count | Date (on or about) | Wire Communication |
|---|---|---|
| 10 | 3/25/2022 | Wire transfer of $920,816.84 from Lender-4 to Medley's Truist x0910 account. |
| 11 | 5/9/2022 | Wire transfer of $950,087.18 from Lender-5 to Medley's First Citizens x0525 account (ref no. 018252). |
| 12 | 5/9/2022 | Wire transfer of $950,087.18 from Lender-5 to Medley's First Citizens x0525 account (ref no. 019770). |
| 13 | 5/9/2022 | Wire transfer of $994,407.47 from Lender-5 to Medley's First Citizens x0525 account (ref no. 019762). |
| 14 | 5/9/2022 | Wire transfer of $994,407.47 from Lender-5 to Medley's First Citizens x0525 account (ref no. 019763). |
| 15 | 5/9/2022 | Wire transfer of $994,407.47 from Lender-5 to Medley's First Citizens x0525 account (ref no. 019764). |
| 16 | 5/9/2022 | Wire transfer of $994,407.47 from Lender-5 to Medley's First Citizens x0525 account (ref no. 019800). |

All in violation of Title 18, United States Code, Sections 1343 and 2.

**Count 17**

*Money Laundering Conspiracy* - 18 U.S.C. § 1956(h)

66. The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 2 through 63 of this Indictment as if fully set forth herein.

67. From at least in or about February 2022, and continuing through at least in or about May 2022, in the Northern District of Georgia and elsewhere, the defendant, **CURTIS DEXTER HULL**, did knowingly combine, conspire,

confederate, agree, and have a tacit understanding with Debra Farrell, Leonard Medley, and others unknown to the Grand Jury, to knowingly engage and attempt to engage in monetary transactions by, through, and to a financial institution, in and affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, all in violation of Title 18, United States Code, Section 1957.

**Manner and Means**

68. When loan proceeds obtained through the specified unlawful activity articulated above were deposited into Medley's Truist x0910 and First Citizens x0525 accounts, **HULL** and his co-conspirators disbursed the fraudulent loan proceeds in a manner designed to appear legitimate and consistent with standard real estate and closing practices.

69. For example, **HULL** made an agreement with Farrell that she would typically receive 1% of the fraudulently obtained loan proceeds as a commission or brokerage fee, and that payments would be made to her company, Funding Solutions.

70. On or about February 24, 2022, Lender-4 made a loan disbursement into Medley's Truist x0910 account in the amount of $921,408.10. On or about February 28, 2022, Medley, based on an arrangement between **HULL** and Farrell, obtained a cashier's check in the amount of $17,012.50 and made payable to Funding Solutions.

71. On or about February 25, 2022, Lender-3 made two loan disbursements into Medley's Truist x0910 account in the amounts of $1,022,173.00 and $1,022,230.32. On or about February 28, 2022, Medley, based on an arrangement between **HULL** and Farrell, wired $64,942.50 to Funding Solutions' Truist account x0281 ("Truist x0281"). The reference line read "Covington Way Commission."

72. On or about March 7, 2022, Lender-4 made a loan disbursement into Medley's Truist x0910 account in the amount of $915,495.50. On or about March 9, 2022, Medley, based on an arrangement between **HULL** and Farrell, wired $17,012.50 to Funding Solutions' Truist x0281 account. The reference line read "Consulting Fee."

73. On or about May 9, 2022, Lender-5 made six loan disbursements into Medley's First Citizens x0525 account. Two of the disbursements were in the amount of $950,087.18, and four were in the amount of $994,407.47. On or about May 12, 2022, Medley, based on an arrangement between **HULL** and Farrell, wired $89,774.50 to Funding Solutions' Truist x0281 account.

74. On numerous occasions, the brokerage fee to Funding Solutions listed on the settlement statements for Transaction-2 did not match the amounts actually remitted to Farrell through Funding Solutions.

75. At all times, **HULL** knew that the brokerage fees sent to Farrell through Funding Solutions were from the proceeds of fraudulently obtained loans for Transaction-2.

All in violation of Title 18, United States Code, Section 1956(h).

**Counts 18 through 21**
*Transactional Money Laundering* - 18 U.S.C. § 1957

76. The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 2 through 63, and 68 through 75, of this Indictment as if fully set forth here.

77. On or about the dates set forth in the following table, in the Northern District of Georgia and elsewhere, the defendant, **CURTIS DEXTER HULL,** aided and abetted by, and aiding and abetting, Debra Farrell, Leonard Medley, and others unknown to the Grand Jury, did knowingly engage in and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, that is, the deposit, withdrawal, transfer, and exchange, in and affecting interstate and foreign commerce, of funds and monetary instruments by, through, and to a financial institution, namely, the monetary transactions described below, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343:

| **Count** | **Date (on or about)** | **Monetary Transaction** |
|---|---|---|
| 18 | 2/28/2022 | Withdrawal from Medley's Truist x0910 account via cashier's check made payable to Funding Solutions in the amount of $17,012.50. |
| 19 | 2/28/2022 | Wire transfer of $64,942.50 from Medley's Truist x0910 account to Funding Solutions' Truist x0281account. |

| Count | Date (on or about) | Monetary Transaction |
|---|---|---|
| 20 | 3/9/2022 | Wire transfer of $17,012.50 from Medley's Truist x0910 account to Funding Solutions' Truist x0281 account. |
| 21 | 5/12/2022 | Wire transfer of $89,774.50 from Medley's First Citizens bank account x0525 to Funding Solutions' Truist account x0281. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

**Forfeiture**

78. Upon conviction of one or more of the offenses alleged in Counts One through Sixteen of this Indictment, the defendant, **CURTIS DEXTER HULL,** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as the result of such offenses. The property to be forfeited includes, but is not limited to, the following:

> MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of the offenses alleged in Counts One through Sixteen of this Indictment.

79. Upon conviction of one or more offenses alleged in Counts Seventeen through Twenty-One of this Indictment, the defendant, **CURTIS DEXTER HULL,** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real or personal, involved in such offenses, or any property traceable to such property, including, but not limited to, the following:

MONEY JUDGMENT: A sum of money in United States currency, representing the amount of property obtained as a result of the offenses alleged in Counts Seventeen through Twenty-One of this Indictment.

80. If any property subject to forfeiture, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the Court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty,

the United States of America intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

A True BILL

FOREPERSON

THEODORE S. HERTZBERG
*United States Attorney*

Angela Adams
ANGELA ADAMS
*Assistant United States Attorney*
Georgia Bar No. 613114

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181